## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| LAUREL HILBERT, on behalf of himself and all others similarly situated,<br>4301 Massachusetts Avenue, N.W.<br>Washington, D.C. 20016<br><br>*Plaintiff,*<br><br>v.<br><br>SNAP, INC. (dba SNAPCHAT)<br>3000 31st Street<br>Santa Monica, CA 90405<br>SERVE:<br>1505 Corporation CSC<br>Lawyers Incorporating Service<br>2710 Gateway Oaks Drive,<br>Sacramento, CA 95833<br><br>*Defendant.* | **Case No.**<br><br><br><br><br><br>**Class Action Complaint**<br><br>**Jury Trial Demand** |

## <u>VERIFIED COMPLAINT</u>

## <u>INTRODUCTION</u>

1.    Plaintiff, Mr. Laurel Hilbert, on behalf of himself and others similarly situated, asserts the following claims against Defendant Snap, Inc. ("Defendant") as follows:

2.    The Supreme Court of the United States has stated "[t]he Internet's prevalence and power have changed the dynamics of the national economy." *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2097 (2018) (the Court noted that in 1992, less than two (2) percent of Americans had Internet access whereas by 2018 the number increased to roughly eighty-

nine (89) percent). This number has steadily increased as polling data from 2021 shows ninety-three (93) percent of American adults use the Internet.[1]

3.  Based on a 2018 report, over forty (40) million people in the United States were documented with a disability, including over seven and a half (7.5) million individuals who have a visual disability.[2] According to the National Federation of the Blind's 2016 report (updated in 2019), approximately 418,500 visually impaired persons lived in the State of New York.[3]

4.  Plaintiff brings this civil rights action against Defendant for its failure to design, construct, maintain, update, and operate its mobile application platforms (hereinafter "mobile application") to be fully accessible to and independently usable by Plaintiff and other blind or visually impaired people.

5.  Plaintiff uses the terms "blind" or "visually impaired" interchangeably to refer to all people with visual impairments who meet the legal definition of blindness in that they have a visual acuity with correction of less than or equal to 20 x 200.

6.  For this significant portion of Americans, accessing mobile applications, mobile applications, and other information has become a necessity, not a convenience.

---

[1]    Internet/Broadband Fact Sheet, PEW RESEARCH CENTER (April 7, 2021) https://www.pewresearch.org/internet/fact-sheet/internet-broadband/ (last visited April 3, 2024). Indeed, the polls also show ninety-nine (99) percent of American adults between the ages of eighteen (18) to twenty-nine (29) use the Internet, and ninety-eight (98) percent of American adults between the ages of thirty (30) to forty-nine (49) use the Internet.

[2]    Lee W. Erickson & S. von Schrader, *2018 Disability Status Report: United States*, CORNELL UNIVERSITY 10 (2020), https://www.disabilitystatistics.org/StatusReports/2018-PDF/2018-StatusReport_US.pdf (last visited June 15, 2025). The report uses data from the 2018 American Community Survey.

[3]    Blindness Statistics, National Federation of the Blind (updated January 2019) https://nfb.org/resources/blindness-statistics (last visited June 15, 2025).

7.     The growth of usage is rivaled only by the myriad ways in which users can harness the capabilities of the internet for the betterment of their lives through education, employment, entertainment, commerce, and countless other pursuits.

8.     The U.S. Chamber of Commerce has documented consumers' increasing reliance on the internet to shop online:

> The average consumer spends more than $1,700 per year on online shopping, a number that's continuing to rise. The convenience, affordability and ability to compare prices with ease has led more and more customers to visit e-commerce sites before heading to a brick-and-mortar location.[4]
> New research by Leanplum found that 95% of consumers will buy at least half of their gifts online. Shoppers, especially millennials and Gen Zers, favor the convenience and the great offers and discounts associated more with shopping online than visiting a brick-and-mortar location. It's these groups that are driving e-commerce retailers to be strategic with their website design. The Leanplum survey found that 80% of respondents shop on their mobile devices.[5]

9.     Even the Supreme Court has acknowledged the phrase, "'There's an app for that' has become part of the 21st-century American lexicon." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1518, 203 L.Ed.2d 802, 806 (2019).

10.    But "[a]s technology continues to evolve at a rapid pace, it is important to consider factors that can facilitate or impede technology adoption and use by people with disabilities."[6]

---

[4]     Emily Heaslip, *A Guide to Building an Online Store*, U.S. Chamber of Commerce (Sept. 20, 2019), https://www.uschamber.com/co/start/startup/how-to-build-online-stores (last accessed June 15, 2025).

[5]     Emily Heaslip, *5 Ways to Optimize Your E-Commerce Site for Mobile Shopping*, U.S. Chamber of Commerce (Jan. 6, 2020), https://www.uschamber.com/co/run/technology/building-mobile- friendly-ecommerce-websites (last accessed June 15, 2025). "According to one report, e- commerce is growing 23% each year[.]" Emily Heaslip, *The Complete Guide to Selling Online*, U.S. Chamber of Commerce (Jan. 28, 2020), https://www.uschamber.com/co/run/technology/small-business-ecommerce-guide (last accessed June 15, 2025).

[6]     *National Disability Policy: A Progress Report*, Nat'l Council on Disability (Oct. 7, 2016), https://ncd.gov/sites/default/files/NCD_ProgressReport_ES_508.pdf (last accessed June 15, 2025);

11.     This is especially true with respect to accessing goods and services over the internet, where people with disabilities stand to benefit immensely if online services were fully and equally accessible to them. The National Federation of the Blind explains:

> In many ways, individuals with disabilities rely on Web content more so than their nondisabled peers because of inherent transportation, communication, and other barriers. A blind person does not have the same autonomy to drive to a covered entity's office as a sighted person. A deaf or hard of hearing person does not have the same opportunity to call a covered entity's office. A person with an intellectual disability does not have the same ability to interact independently with the staff at a covered entity's office. The 24-hour-a-day availability of information and transactions on covered entity websites and mobile apps provides a level of independence and convenience that cannot be replicated through any other means. That is why the number of Americans who rely on the Internet has increased year after year and why entities offer information and transactions through that unique medium.[7]

12.     Digital platforms are a vital part of how Plaintiff maintains communication, expresses himself, and stays connected with others. Snapchat is not just a social application – it is a distinct and widely used platform for real-time, casual, and often audio-based communication, and it plays a unique role in how people form and sustain relationships.

13.     Unlike traditional social media platforms like Facebook or Instagram, Snapchat emphasizes ephemeral, one-on-one communication — voice notes, short videos, disappearing photos, or quick thoughts that reflect the moment. These are not meant for public broadcast; they are meant for connection. It is one of the few apps where users feel comfortable sharing real-life, unfiltered moments without fear of long-term visibility or

---

*see also* Progress Report 2023: Towards Economic Security: The Impact of Income and Asset Limits on People with Disabilities (2023), https://www.ncd.gov/report/2023-progress-report-toward-economic-security-the-impact-of-income-and-asset-limits-on-people-with-disabilities/ (accessed March 9, 2024).

[7]     Comment from disability rights organizations to DOJ Supplemental Advance Notice of Proposed Rulemaking "Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities," C RT Docket No 128, RIN 119 -AA65, Answer 57 (October 7, 2016) (citations omitted).

judgment.

14.     Mr. Hilbert first began using Snapchat because it allowed him to connect more authentically with friends and peers, especially in contexts where other platforms felt too formal or public. Sharing real-life, unfiltered moments is important to Mr. Hilbert, especially as someone who does not always feel centered or visible in other online spaces.

15.     Especially when meeting new people in social settings, particularly younger people or those active in digital culture, they are often more comfortable sharing their Snapchat handle opposed to their phone number. Snapchat has effectively become a gateway to social connection – it is where friendships begin and evolve- making it an ideal mode for Mr. Hilbert to develop relationships.

16.     When digital content is properly formatted, it is universally accessible to everyone.  When it is not, the content provider fails to communicate to individuals with a visual disability effectively. In turn, these individuals must expend additional time and effort to overcome communication barriers not applicable to sighted users, which may require the assistance of third parties or, in some instances, may deny outright access to the online service.[8]

17.     Unfortunately, Mr. Hilbert cannot fully and equally access Defendant's mobile application because Defendant's accessibility policies and practices have made it impossible to fully and equally perceive, understand, or operate the mobile application's content with screen reader auxiliary aids.

---

[8]     These factors often lead disabled individuals to abandon the process of purchasing items online after they begin.  Kasey Wehrum, *Your Website is Scaring Customers Away. 5 Easy Ways to Fix It.*, Inc. Mag. (Jan. 2014), https://www.inc.com/magazine/201312/kasey-wehrum/how-to-get- online-customers-to-complete-purchase.html (last accessed June 15, 2025) (documenting the most common causes of shopping cart abandonment, including: "Your Checkout button is hard to find[,]" "Shoppers question the safety of their personal info[,]" and "Getting through the checkout process takes multiple clicks.").

18.     If Mr. Hilbert is excluded from using Snapchat, he is effectively excluded from a primary channel through which people are building modern relationships. This exclusion is not theoretical – it plays out in real, everyday life, when others pull out their phones and connect with each other while Mr. Hilbert is left out of the exchange.

19.     As a result, this action for injunctive relief seeks an order requiring that Defendant (a) make its mobile application accessible to Mr. Hilbert, and (b) adopt sufficient policies and practices, the details of which are more fully described below, to ensure the mobile application does not become inaccessible again in the future.

20.     Defendant's denial of full and equal access to its mobile application and therefore denial of its goods and services offered thereby is a violation of Plaintiff's rights under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C § 12182(a), the New York State Human Rights Law ("NYSHRL"), N.Y. CLS Exec. §§ 290, *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-1010, *et seq.*

21.     Because Defendant's mobile application is not equally accessible to blind and visually impaired consumers, they violate the ADA, the NYSHRL, and the NYCHRL.  Plaintiff seeks a permanent injunction, actual and liquidated damages, and reasonable attorneys' fees and costs to cause a change in Defendant's corporate policies, practices, and procedures so that Defendant's mobile application will become and remain accessible to blind and visually impaired consumers.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction over this action under 28 U.S.C § 1331 and 42 U.S.C. § 12181 as Plaintiff's claims arise under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, *et seq.* and 28 U.S.C. § 1332.

23.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's claims under the New York State Human Rights Law ("NYSHRL"), N.Y. CLS Exec. §§ 290, *et seq*., and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101, *et seq*.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendant conducts and continues to conduct a substantial and significant amount of business in this District via the internet regarding the subject mobile application addressed by this action.

25.     Defendant is subject to personal jurisdiction in this District.  Defendant has been and is committing the acts or omissions alleged herein in this District that caused some of the injury and violated the rights of Plaintiff and to other blind and visually impaired customers in this District under the ADA, the NYSHRL, and the NYCHRL.  A substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

26.     In particular, Plaintiff has been denied the full use and enjoyment of the goods and services offered to the general public through Defendant's mobile application.  Plaintiff lost significant opportunities to connect with others through this mainstream social media platform being offered by Defendant due to the discriminatory roadblocks faced as a result of Defendant's failure to provide online goods and services that he could effectively utilize as a visually impaired person.

27.     Further, these access barriers that Plaintiff encountered have caused a denial of Plaintiff's full and equal access multiple times in the past, and now deters Plaintiff on a regular basis from accessing the Defendant's mobile application in the future without the aid of a sighted person to help him navigate, which is antithetical to the freedoms promised to the visually impaired by the passage of federal and state disability civil rights legislation.

28.     This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and

         2202.

## PARTIES

29.     Plaintiff Laurel Hilbert resides in Washington, D.C. but routinely visits his family and

         friends in New York City, including during the relevant time period.  In each location, he

         attempted to access Defendant's mobile application to connect with others and foster

         positive relationships with those he has associated.  Regrettably, he was unsuccessful in

         effectively using Defendant's social media platform due to the inaccessibility of the mobile

         application.

30.     Not only was Mr. Hilbert injured in fact on or about March 2023 to the present (thinking

         that by now the inaccessible features of Defendant's mobile application would have been

         fixed), but also, his future attempts to use Defendant's mobile application will injure him

         again if the inaccessible features are not remediated in conformity with the Americans with

         Disabilities Act requirements.   He would like to use the Snapchat platform again as his

         primary means of fostering human connections but will be unable to do so in the future if

         the problems persist.

31.     Plaintiff is a blind, visually-impaired handicapped person and a member of a protected

         class of individuals under the Americans with Disabilities Act ("ADA") pursuant to 42

         U.S.C. §§ 12102(1) – (2), and the regulations implementing the ADA set forth at 28 C.F.R

         § 36.101 *et seq.*, and the New York State Human Rights Law ("NYSHRL"), N.Y. CLS

         Exec. §§ 290, *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C.

         Admin. Code §§ 8-101, *et seq.*

32.     Defendant Snap, Inc. ("Defendant") is and was at all relevant times a corporation incorporated in Delaware, headquartered in California, and does business in the Southern District of New York through its internet-based online mobile application and its physical location.

33.     Defendant owns and administers https://apps.apple.com/us/app/snapchat/id447188370 and its goods and services online and has offered them to the general public through its mobile application, which is a public accommodation within the definition of the ADA, 42 U.S.C. § 12181(7), the New York State Human Rights Law ("NYSHRL"), N.Y. CLS Exec. §§ 290, *et seq.*, the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101, *et seq.*, as well as a "Provider" under the NYCHRL.

## NATURE OF ACTION

34.     The Internet has become a significant source of information, a portal, and a tool for conducting business, doing everyday activities such as shopping, learning, banking, researching, as well as many other activities for sighted, blind and visually impaired persons alike.

35.     In today's tech-savvy world, blind and visually impaired people have the ability to access mobile applications and online platforms using keyboards in conjunction with screen access software that vocalizes the visual information found on a computer screen or displays the content on a refreshable Braille display.  This technology is known as screen-reading software.  Screen-reading software is currently the only method a blind or visually impaired person may independently access the internet.  Unless mobile applications are designed to be read by screen-reading software, blind and visually impaired persons are

unable to fully access mobile applications and the information, products, and goods contained thereon.

36.    Blind and visually impaired users of Windows operating system-enabled computers and devices have several screen-reading software programs available to them. Some of these programs are available for purchase and other programs are available without the user having to purchase the program separately. Nonvisual Desktop Access, otherwise known as "NVDA", and "JAWS" are popular, screen-reading software programs available for a Windows computer. "VoiceOver" is a popular program for Apple devices.

37.    For screen-reading software to function, the information on a mobile application must be capable of being rendered into text. If the mobile application content is not capable of being rendered into text, the blind or visually impaired user is unable to access the same content available to sighted users. For VoiceOver, users such as Mr. Hilbert rely on a mobile application's features and proper coding, including but not limited to "ARIA" ("accessible rich internet applications") in the Web Content Accessibility Guidelines ("WCAG"). ARIA provides what is presented visually for a visually impaired person.

38.    The international mobile application standards organization, the World Wide Web Consortium, known throughout the world as "W3C," has published version 2.1 of the Web Content Accessibility Guidelines ("WCAG 2.1"). WCAG 2.1 are well-established guidelines for making mobile applications accessible to blind and visually impaired people. These guidelines are universally followed by most large business entities and government agencies to ensure their mobile applications are accessible.

## STATEMENT OF FACTS

39.  Defendant Snap, Inc. ("Defendant") is a Delaware corporation that owns and operates the https://apps.apple.com/us/app/snapchat/id447188370 mobile application offering features which should allow all consumers to access the goods and services provided via the internet throughout the United States, including the Southern District of New York.

40.  Defendant's mobile application offers its products and services to the public. The mobile application offers features which ought to allow and avail consumers the ability to peruse numerous functions to complete a sought-after transaction, including, as in Mr. Hilbert's case, the ability to create a profile and use Snapchat's features.

41.  Plaintiff Laurel Hilbert is a visually impaired and legally blind person, who cannot use a computer without the assistance of screen-reading software. Plaintiff is, however, a proficient VoiceOver screen-reader user and uses primarily VoiceOver to access the internet, online programs within mobile applications. Plaintiff has visited and attempted to access Defendant's mobile application using a screen-reader on numerous occasions.

42.  Defendant attempted to use the mobile application from March 2023 to June 2025. Regrettably, he was unable to do so due to inaccessibility issues.

43.  Despite his efforts, Plaintiff was denied a user experience similar to that of a sighted individual due to the mobile application's lack of a variety of features and accommodations, which effectively barred Plaintiff from being able to enjoy the privileges and benefits of Defendant's goods and services.

44.  Mr. Hilbert owns and uses a MacBook and iPhone and uses Safari as his main internet browser. Safari and MacBook/iPhone harnesses Apple's "Voice-Over Software" which

enables blind and/or visually impaired persons such as Mr. Hilbert to access and enjoy mobile applications by reading aloud functions on a website.

45.    Screen-reading software includes the functionality "Quick Navigation," which enables screen readers to navigate through a mobile application using its headings, links, buttons, tables, etc.  Specifically, when a screen reader types letters, they correspond to what kind of functions a screen reader uses to learn what it is that a mobile application offers.  For example, if Mr. Hilbert enables "Quick Navigation," he can navigate through a mobile application by using its headings.  He will press "H" on his keyboard once "Quick Navigation" is enabled.

46.    When mobile applications fail to incorporate the proper and descriptive coding to mark what kinds of functions are on their mobile application,  not only does this prevent the "Quick Navigation" functionality to locate the functions on the mobile application but the read-aloud functions that lack description confuse software users like Mr. Hilbert who cannot rely on any visuals to navigate through and access a mobile application.

### Inaccessibility of Mobile Application

47.    Snapchat remains profoundly inaccessible to blind users, like Plaintiff.

48.    In particular, when using the Snapchat app, the main screen initially presents Mr. Hilbert with several options such as profile, search, and add friends. The camera screen opens without prompting and traps the screen reader focus, preventing navigation.

49.    However, clarity diminishes as ambiguous buttons follow, labeled merely as "button" without indicating their function. This confusion persists with subsequent buttons like "vertical", "camera chooser selfie", and "off button", leaving Mr. Hilbert uncertain about their purpose.

50.     As Mr. Hilbert moved through the app's pages, the lack of descriptive labeling continues to impede navigation. Clicking on profile, for instance, reveals options ambiguously labeled as "image", providing no insight into their functionality. The frustration deepens with elements like "image back" and "image shared", where clickability remains uncertain until a double tap confirms action.

51.     Returning to the main screen to access the "add friends" button, further confusion ensues with labels such as "image more" and "as image", failing to clarify their intended use. Despite his efforts to find a clear navigation pathway, the absence of a discernible button for backward movement complicates his interaction.

52.     Closing and relaunching the app offers no respite from the perplexing experience. Even upon reopening, buttons continue to be labeled simply as "button", leaving him guessing about their purpose.

53.     Text input fields are also inconsistently announced, and buttons to send messages, record audio, or react to Snaps are either not focusable or not announced at all.

54.     Clicking on "vertical" leads to a page cluttered with elements like "image add", "image video", and "image music", lacking clarity on their clickability and function. Mr. Hilbert's frustration peaked when attempting to navigate backward, encountering a button cryptically labeled as "ccc_exit_button" image.

55.     Initial attempts to interact with it yielded no response, further exacerbating his confusion. Even upon successful interaction, feedback on the action remained elusive. Exploration of other app sections like "map tap", "chat tap", "camera tap", "stories tap", and "spotlight tap" proved equally challenging.

56.  Clicking on these taps failed to provide feedback or indication of selection, rendering interaction with the Snapchat app inaccessible. This inaccessible experience left Mr. Hilbert disheartened and unable to utilize the app effectively, mirroring the experience of sighted users.

57.  Further, features like Snap Map, Stories, and Bitmoji are presented as purely visual without descriptive alternatives or screen reader support.

58.  Mr. Hilbert contacted Snapchat support and informed them of the accessibility issues, though the accessibility issues remain unaddressed. Mr. Hilbert has used the site in Washington D.C. from March 2023 to April 2023, in California from April 2023 to April 2023, in Washington DC from April 2023 to May 2023, and from New York City from June 2023 to June 2025, making multiple attempts to use the platform without success.

59.  These access barriers effectively denied Plaintiff the ability to use and enjoy Defendant's mobile application the same way sighted individuals do. He is unable to create, send, or respond to Snaps independently. He cannot add friends, view stories, or participate in conversations.

60.  Mr. Hilbert desperately wants to use Snapchat as a means of modern, informal communication in order to connect with both existing friends and new people he meets socially.

61.  Upon information and belief, Defendant's policies and practices denied Plaintiff, along with other blind or visually impaired users, access to Defendant's mobile application. Those policies and/or practices therefore specifically denied the goods and services that are offered to the general public.

62.     Due to Defendant's failure and refusal to remove access barriers to its mobile application, Plaintiff and visually impaired persons have been and are still being denied equal access to Defendant's mobile application, and the numerous goods, services and benefits offered to the public through that application.

63.     The access barriers Plaintiff encountered have caused a denial of his full and equal access in the past and now deter Plaintiff on a regular basis from utilizing the mobile application, presently and in the future.

64.     If the mobile application were equally accessible to all, Plaintiff could independently navigate the mobile application and access and complete the desired transaction through Defendant's mobile application as sighted individuals do.  He also would not have to use the services of a sighted person to perform simple interactions with Defendant's mobile application.  It is humiliating for a visually impaired person to rely upon the largess of sighted strangers to navigate through the world.  The internet world is no different.

65.     Through his attempts to use the mobile application, Plaintiff has actual knowledge of the access barriers that make these services inaccessible and independently unusable by blind and visually impaired persons.

66.     Because simple compliance with the WCAG 2.1 Guidelines would provide Plaintiff and other visually impaired consumers with equal access to the mobile application,  Plaintiff alleges that Defendant has engaged in acts of intentional discrimination, including but not limited to the following policies or practices:

   a.  Constructing and maintaining mobile application that are inaccessible to visually impaired individuals, including Plaintiff;

b. Failing to construct, update and maintain mobile application that are sufficiently intuitive so as to be equally accessible to visually impaired individuals, including Plaintiff; and

c. Failing to take actions to correct these access barriers in the face of substantial harm and discrimination to blind and visually impaired consumers, such as Plaintiff, as a member of a protected class.

67. Defendant therefore uses standards, criteria or methods of administration that have the effect of discriminating or perpetuating the discrimination of others, as alleged herein.

68. The Americans with Disabilities Act ("ADA") expressly contemplates the injunctive relief that Plaintiff seeks in this action. In relevant part, the ADA requires:

> In the case of violations of … this title, injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities … Where appropriate, injunctive relief shall also include requiring the … modification of a policy …

42 U.S.C. § 12188(a)(2).

69. Upon information and belief, because Defendant's mobile application has never been accessible, and Defendant does not have, and never had, an adequate corporate policy that is reasonably calculated to cause its mobile application to become and remain accessible, Plaintiff invokes 42 U.S.C. § 12188(a)(2) and seeks a permanent injunction requiring:

a. That Defendant retain a qualified consultant acceptable to Plaintiff ("Mutually Agreed Upon Consultants") who shall assist it in improving the accessibility of its mobile application so that the goods and services on them may be equally accessed and enjoyed by individuals with vision-related disabilities;

b. That Defendant work with the Mutually Agreed Upon Consultant to ensure that all employees involved in its mobile application's development and content development

be given web accessibility training on a periodic basis at least two (2) times per year, including onsite training to create accessible content at the design and development stages;

c.  That Defendant work with the Mutually Agreed Upon Consultant to perform an automated accessibility audit on a periodic basis at least two (2) times per year to evaluate whether its mobile application may be equally accessed and enjoyed by individuals with vision-related disabilities on an ongoing basis;

d.  That Defendant work with the Mutually Agreed Upon Consultant to perform end-user accessibility/usability testing on a periodic basis at least two (2) times per year with said testing to be performed by individuals with various disabilities to evaluate whether its mobile application may be equally accessed and enjoyed by individuals with vision-related disabilities on an ongoing basis;

e.  That Defendant work with the Mutually Agreed Upon Consultant to create an accessibility policy that will be posted on its mobile application,  along with an e-mail address and tollfree phone number to report disability accessibility-related problems; and

f.  That Defendant and its computer and/or internet experts monitor Defendant's mobile application for up to two (2) years after the Mutually Agreed Upon Consultant validates that the mobile application are free of accessibility errors/violations to ensure that it has adopted and implemented adequate accessibility policies.

g.  That Defendant provide Plaintiff's counsel and this Court a report every six (6) months of its efforts to comply and its continued compliance with the ADA, including a representation and warranty that its mobile application are free of accessibility

errors/violations and to ensure that it has adopted and implemented adequate accessibility policies, which remain legally compliant with disability laws, functional and up-to-date.

70.     Web-based technologies have features and content that are modified on a daily, and in some instances, hourly basis and a one-time "fix" to an inaccessible mobile application and/or mobile application will not cause the mobile application and/or mobile applications to remain accessible without a corresponding change in corporate policies related to those web-based technologies.  To evaluate whether an inaccessible mobile application has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful and legally-compliant manner that will cause the mobile application and/or mobile applications to remain accessible, Defendant's mobile application must be reviewed on a periodic basis not less than two (2) times per year using both automated accessibility screening tools and end user testing by disabled individuals.

71.     Although Defendant may currently have centralized policies regarding maintaining, updating and operating its mobile application, Defendant lacks a plan and policy reasonably calculated to make them fully and equally accessible to, and independently usable by, blind and other visually impaired consumers.

72.     Defendant has, upon information and belief, invested substantial sums in developing and maintaining its mobile application and has generated significant revenue from its mobile application in New York, New York.  These amounts are far greater than the associated cost of making its mobile application equally accessible to visually impaired customers.

73.     Without injunctive relief, Plaintiff and other visually impaired consumers will continue to be unable to independently use the mobile application, violating their rights.

**FIRST CAUSE OF ACTION**
**Violation of the Americans with Disabilities Act**
**(42 U.S.C. § 12181 *et seq.*)**

74.     Plaintiff, on behalf of himself and other visually impaired persons, repeats and realleges

every allegation of the preceding paragraphs as if fully set forth herein.

75.     Section 302(a) of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

12101, *et seq.*, provides:

> No individual shall be discriminated against on the basis of disability in the
> full and equal enjoyment of the goods, services, facilities, privileges,
> advantages, or accommodations of any place of public accommodation by
> any person who owns, leases (or leases to), or operates a place of public
> accommodation.

42 U.S.C. § 12182(a).

76.     Defendant's mobile application is a place of public accommodation within the definition

of Title III of the ADA, 42 U.S.C. § 12181(7).  *See Martinez v. Gutsy LLC*, 2022 U.S. Dist.

LEXIS 214830, 2022 WL 17303830, at *1, 7 (E.D.N.Y. Nov. 29, 2022) (on a motion to

dismiss, holding that plaintiff plausibly stated a claim of discrimination due to allegedly

inaccessible website); *Del-Orden v. Bonobos, Inc.*, 2017 U.S. Dist. LEXIS 209251, 2017

WL 6547902, at *1 (S.D.N.Y. Dec. 20, 2017) (same); *Romero v. 88 Acres Foods, Inc.*, 580

F.Supp.3d 9, 19 (S.D.N.Y. 2022) (collecting cases); *see also Tavarez v. Moo Organic*

*Chocolates, LLC*, No. 21-CV-9816 (VEC), 2022 U.S. Dist. LEXIS 154249, at *2 (S.D.N.Y.

Aug. 26, 2022) ("concur[ing] with the vast majority of other judges in this District who

have decided the issue that a 'place of public accommodation' includes public-facing

mobile applications that are not tethered to a physical location" while "not[ing] that at least

seven of its colleagues, one of whom has since ascended to the Second Circuit, have found

that Title III of the ADA applies to websites"); *Wilson v. Fabric Cellar, Inc.*, No. 20-CV-

19

244S, 2021 U.S. Dist. LEXIS 130536 (W.D.N.Y. July 13, 2021) (choosing to "assume without deciding" that the mobile application is a place of public accommodation based on the weight of the case law in the circuit); *Slade v. Life Spectacular, Inc.*, No. 22-CV-0037 (ALC), 2022 U.S. Dist. LEXIS 220079, at *9 (S.D.N.Y. Dec. 5, 2022); *Panarese v. Sell It Soc., LLC*, No. 19-CV-3211 (ARR) (RML), 2020 U.S. Dist. LEXIS 119002, at *2 (E.D.N.Y. July 2, 2020), *adopted by* 2020 U.S. Dist. LEXIS 139893, (Aug. 5, 2020); *Reed v. 1-800-Flowers.com, Inc.*, 327 F. Supp. 3d 539, 550 (E.D.N.Y. 2018); *Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 398 (E.D.N.Y. 2017).

77.   The mobile application is a service offered to the general public and, as such, must be equally accessible to all potential consumers.

78.   Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the products, services, facilities, privileges, advantages, or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

79.   Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the products, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded to other individuals. 42 U.S.C. § 12182(b)(1)(A)(ii).

80.   Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things:

> [A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure

> to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

42 U.S.C. §§ 12182(b)(2)(A)(ii) – (iii).

81.   The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder.

82.   Plaintiff, who is a member of a protected class of persons under the ADA, has a physical disability that substantially limits the major life activity of sight within the meaning of 42 U.S.C. §§ 12102(1)(A) – (2)(A).

83.   Mr. Hilbert is directly harmed as a result of Snapchat's inaccessibility as he is unable to utilize an app which facilitates real-life, unfiltered moments, a feature so vital to Mr. Hilbert, who does not always feel centered or visible in other online spaces.

84.   Furthermore, Plaintiff has been denied full and equal access to the mobile application offered by Defendant, has not been provided services that are provided to other patrons who are not disabled, and has been provided services that are inferior to the services provided to non-disabled persons.  Defendant has failed to take any prompt and equitable steps to remedy its discriminatory conduct.  These violations are ongoing.

85.   Under 42 U.S.C. § 12188 and the remedies, procedures, and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

## SECOND CAUSE OF ACTION
### Violation of the NYSHRL
### (N.Y. CLS Exec. §§ 290, *et seq.*)

86.    Plaintiff, on behalf of himself and other visually impaired persons, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

87.    The New York State Human Rights Law ("NYSHRL") guarantees "equal opportunity to enjoy a full and productive life" whereby "every individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the state" as the state works towards "eliminat[ing] and prevent[ing] discrimination in … places of public accommodation … and to take other actions against discrimination[.]" N.Y. CLS Exec. § 290(3).

88.    The NYSHRL also states: "The term 'disability' means (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment[.]" N.Y. CLS Exec. § 292(21).

89.    Plaintiff has a physical disability as a visually impaired and legally blind person, who cannot use a computer without the assistance of screen-reading software.

90.    Pursuant to the NYSHRL: "It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, … because of the … disability, …, of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof[.]" N.Y. CLS Exec. § 296(2)(a).

91.    Defendant is systematically violating the NYSHRL.

92.    Defendant is a "place of public accommodation" within the meaning of the NYSHRL because it is an "establishment dealing with goods and services of any kind," N.Y. CLS Exec. § 292(9), which includes the provision of mobile application to consumers in the State of New York.

93.    Defendant's mobile application is a service provided by Defendant that is inaccessible to patrons like Mr. Hilbert who is visually impaired.  This inaccessibility has denied those visually impaired full and equal access to the facilities and services Defendant makes available to the non-disabled public.  Defendant has violated the NYSHRL by denying visually impaired customers the services and products provided by its mobile application. These violations are ongoing.

94.    Defendant's actions constitute intentional discrimination against Plaintiff on the basis of a disability in violation of the NYSHRL because Defendant constructed and/or maintains its mobile application,  which are inaccessible to Plaintiff, knowingly maintains its mobile application in their inaccessible form, and has failed to take adequate actions to correct these discriminatory barriers even after being notified of the effects of that discrimination.

95.    Mr. Hilbert is directly harmed as a result of Snapchat's inaccessibility as he is unable to utilize an app which facilitates real-life, unfiltered moments, a feature so vital to Mr. Hilbert, who does not always feel centered or visible in other online spaces.

96.    Defendant is also violating the NYSHRL because the conduct alleged herein likewise constitutes a violation of the various provisions under the ADA, 42 U.S.C. § 12101 *et seq.* The U.S. District Court for the Southern District of New York has held that a claim for disability discrimination under the NYSHRL is governed by the same legal standards as the ADA. *Range v. 535 Broadway Grp. LLC*, 2019 U.S. Dist. LEXIS 149905 at *16

(S.D.N.Y. 2019) (*citing Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006)

(citation omitted)); *see also Sullivan v. Study.com LLC*, 2019 U.S. Dist. LEXIS 47073 at

*16 (S.D.N.Y. 2019) ("It is true that the NYSHRL … [is] governed by the same legal

standards that courts apply to ADA disability discrimination claims.").

97.    Defendant's actions were and are in violation of the ADA and NYSHRL and, therefore,

Plaintiff and others similarly situated are entitled to injunctive relief remedying the

discrimination. N.Y. CLS Exec. §§ 297(4)(c)(i) – (ii).

98.    Plaintiff and those similarly situated are also entitled to a preliminary and permanent

injunction enjoining Defendant from violating the NYSHRL and requiring Defendant to

take the steps necessary to make its mobile application readily accessible to and usable by

visually impaired individuals. N.Y. CLS Exec. §§ 297(4)(c)(i) – (ii).

99.    Defendant's denial of accessible mobile application and its discrimination against Plaintiff

and those similarly situated renders it liable for each and every offense for compensatory

damages in an amount to be determined by a jury and civil penalties that may be determined

by the Court.  N.Y. CLS Exec. §§ 297(4)(c)(iii) – (vi).

**THIRD CAUSE OF ACTION**
**Violation of the NYCHRL**
**(N.Y.C. Admin. Code §§ 8-101, *et seq.*)**

100.    Plaintiff, on behalf of himself and other visually impaired persons, repeats and realleges

every allegation of the preceding paragraphs as if fully set forth herein.

101.    The New York City Human Rights Law ("NYCHRL") declares that "there is no greater

danger to the health, morals, safety and welfare to the city and its inhabitants than the

existence of groups prejudiced against one another and antagonistic to each other because

of their actual or perceived differences, including those based on … disability[.]" N.Y.C. Admin. Code § 8-101.

102.   The NYCHRL defines a disability as "any physical, medical, mental or psychological impairment, or a history or record of such impairment. … The term 'physical, medical, mental, or psychological impairment' means: [a]n impairment of any system of the body; including, but not limited to, the neurological system; the musculoskeletal system; the special sense organs and respiratory organs, including, but not limited to, speech organs; the cardiovascular system; the reproductive system; the digestive and genito-urinary systems; the hemic and lymphatic systems; the immunological systems; the skin; and the endocrine system[.]" N.Y.C. Admin. Code § 8-102.

103.   Plaintiff has a physical disability as a visually impaired and legally blind person, who cannot use a computer without the assistance of screen-reading software.

104.   Pursuant to the NYCHRL: "It shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation: [b]ecause of any person's actual or perceived … disability, …, directly or indirectly: [t]o refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation[.]" N.Y.C. Admin. Code § 8-107(4)(1)(a).

105.   Defendant is a "place of public accommodation" within the meaning of the NYCHRL because it is a *provider* "of goods, services, facilities, accommodations, advantages or privileges of any kind, and places, whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold,

or otherwise made available[,]" N.Y.C. Admin. Code 8-102, which includes the provision of mobile application to consumers in New York City.

106.   Defendant is systematically violating the NYCHRL.

107.   Defendant's mobile application is a service provided by Defendant that is inaccessible to patrons like Mr. Hilbert who is visually impaired.  This inaccessibility has denied those visually impaired full and equal access to the facilities and services Defendant makes available to the non-disabled public.  Defendant has violated the NYCHRL by denying visually impaired customers the services and products provided by the mobile application. These violations are ongoing.

108.   Defendant's actions constitute intentional discrimination against Plaintiff on the basis of a disability in violation of the NYCHRL because Defendant constructed and/or maintains its mobile application, which are inaccessible to Plaintiff, knowingly maintains its mobile application in this inaccessible form, and has failed to take adequate actions to correct these discriminatory barriers even after being notified of the effects of that discrimination.

109.   Mr. Hilbert is directly harmed as a result of Snapchat's inaccessibility as he is unable to utilize an app which facilitates real-life, unfiltered moments, a feature so vital to Mr. Hilbert, who does not always feel centered or visible in other online spaces.

110.   Defendant is also violating the NYCHRL because the conduct alleged herein likewise constitutes a violation of the various provisions under the ADA, 42 U.S.C. §§ 12101 *et seq.* and the NYSHRL, N.Y. CLS Exec. §§ 290 *et seq.*  The U.S. District Court for the Southern District of New York has held that the NYCHRL has a "one-way ratchet whereby the ADA standard constitutes its floor."  *Sullivan v. Study.com LLC*, 2019 U.S. Dist. LEXIS 47073 at *16 (S.D.N.Y. 2019) (*citing Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d

Cir. 2009)).  Specifically, the Second Circuit Court of Appeals has affirmed that the NYCHRL "must be reviewed independently from and 'more liberally' than their federal and state counterparts" where interpretation of state or federal statutes with similar wording "may be used to aid in interpretation of [the NYCHRL], viewing similarly worded provisions of federal and state civil rights laws as a *floor* below which the [NYCHRL] cannot fall." *Leoffler*, 582 F.3d at 278 (*quoting* THE LOCAL CIVIL RIGHTS RESTORATION ACT OF 2005, N.Y.C. Local Law No. 85 (2005) at § 1).

111.   Defendant's actions were and are in violation of the ADA, NYSHRL, and the NYCHRL and, therefore, Plaintiff and others similarly situated are entitled to injunctive relief remedying the discrimination.

112.   Plaintiff and those similarly situated are also entitled to a preliminary and permanent injunction enjoining Defendant from violating the NYCHRL and requiring Defendant to take the steps necessary to make its mobile application readily accessible to and usable by visually impaired individuals. N.Y.C. Admin. Code § 8-120(a).

113.   Defendant's denial of accessible mobile application and its discrimination against Plaintiff and those similarly situated renders it liable for each and every offense for compensatory damages in an amount to be determined by a jury, civil penalties, and reasonable attorney's fees and costs that may be determined by the Court.  N.Y.C. Admin. Code §§ 8-120(a), 8-126(a).

## FOURTH CAUSE OF ACTION
### Declaratory Relief

114.   Plaintiff, on behalf of himself and other visually impaired persons, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

115.  An actual controversy has arisen and now exists between the parties in that Plaintiff
      contends and is informed and believes that Defendant denies that its mobile application
      contain access barriers denying blind and/or visually impaired customers the full and equal
      access to the products, services and facilities contained in its mobile application,  which
      Defendant owns, operates and controls, fails to comply with applicable laws, including but
      not limited to Title III of the Americans with Disabilities Act, the NYSHRL, and the
      NYCHRL, prohibiting discrimination against the blind and visually impaired.

116.  A judicial declaration is necessary and appropriate at this time in order that each of the
      parties may know their respective rights and duties and act accordingly.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court grant the following relief:

A.    For a judgment that Defendant violated Plaintiff's rights under the ADA, the
      NYSHRL, and the NYCHRL;

B.    A preliminary and permanent injunction prohibiting Defendant from violating the
      Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12182, *et seq.*, the
      NYSHRL, and the NYCHRL;

C.    A preliminary and permanent injunction requiring Defendant to take all steps
      necessary to make its mobile application fully compliant with the requirements set
      forth in the ADA and its implementing regulations, so that the mobile application
      are regularly accessible to and usable by blind and visually impaired individuals;

D.    A declaration that Defendant owns, maintains, and/or operates its mobile
      application in a manner that discriminates against the blind and visually impaired

persons, and which fails to provide access for persons with disabilities as required

by the ADA, the NYSHRL, and the NYCHRL;

E.      Economic, compensatory and/or punitive damages under the NYSHRL and/or the

NYCHRL, as applicable, in an amount to be determined at trial;

F.      Pre- and post-judgment interest;

G.      An award of costs and expenses of this action together with reasonable attorneys'

and expert fees; and

H.      Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all questions of fact

raised by the Complaint.

Dated: June 30, 2025                           Respectfully submitted,

**ERIC SIEGEL LAW, PLLC**

By   /s/ Eric L. Siegel
Eric L. Siegel (Bar No. 2344935)
esiegel@ericsiegellaw.com
888 17th Street, N.W., Suite 1200
Washington, D.C. 20006
(771) 220-6116 (Office)
(202) 223-6625 (Facsimile)

*Attorney for Plaintiff Laurel Hilbert*

## VERIFICATION

I, Laurel Hilbert, have read the factual allegations of this Verified Complaint for which I provided direct personal experience and information pertaining to the inaccessibility of Defendant's mobile application and verify under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.  Executed on June 30, 2025.

_____
Laurel Hilbert, Plaintiff